Good afternoon, Your Honors. I'm David Kyle. I'm for the appellant and I'm with Mr. Robert Scott Stauffman. This is a case of a wrongful death that the judge in the lower court granted immunity to the officer for the death, purportedly because there was probable cause. We contend that there was no probable cause. Mr. Aguirre, the decedent, after a high-speed chase, ran away from the officer, knocked on the door of his friend's or girlfriend's home, and while standing there, shaking the door for at least 30 seconds, received four bullets to the back and the side. At no point in time was he ever a threat to the occupants or the officer. Frankly, they... JUSTICE KENNEDY You say bullets in the back? MR. AGUIRRE Yes, sir. JUSTICE KENNEDY Is that a disputed issue? MR. AGUIRRE It is not. The coroner's, the deputy coroner's, deposition was taken and he indicated that the trajectory of the bullets, five, perhaps one was a reentry, occurred at least two to three in the back in a downward position, and therefore, and then, I believe, one to the stomach on the side. That's undisputed. JUSTICE KENNEDY There was some evidence that the deceased had turned toward the officer. MR. AGUIRRE That is disputed as well. That's a Mr. Davis, the officer, testified to that. However, the police tactics, plaintiff's police tactics expert as well as the ballistics expert as well as the deputy coroner concluded that that was improbable because of the man's hands being both on the doorknob and it was inconceivable that he could turn his body and accomplish what Officer Davis said he observed. JUSTICE KENNEDY Well, where's the evidence that both hands were in the doorknob? MR. AGUIRRE Officer Davis testified. JUSTICE KENNEDY I thought he said he saw a hand going to the waistband. MR. AGUIRRE Yes, he did. And that's when he went and began shooting. But here again, the deputy coroner concluded that that was not possible because of the trajectory of the bullet. JUSTICE KENNEDY But as to the hands on the doorknob, is that where the decedent was found? I mean, what's the disputed issue of fact on that? MR. AGUIRRE Eyewitnesses. There were two outside. There were probably, I think, four inside at least within a couple of feet of one another because of them being in the living room. That's the room that you enter when you initially enter the home. They heard the rattling of the door, Mr. Landeros, as well as the other eyewitness who was feet from Officer Davis observed the decedent with his hands on the door. JUSTICE KENNEDY Right. I think there's no question about that. The question is whether or not he removed his hand from the door and then turned as Officer Davis testified. Is there a – what is the disputed factual issue that you tender on that question? MR. AGUIRRE I would go with the deputy coroner. The deputy coroner said that that's not possible because at that point in time, Officer Davis began firing, if you believe and accept his version of the story or the facts, that the bullets would have been at a different angle, perhaps through the man's right arm, and that did not occur. It was at a downward trajectory into the man's body and to the back. JUSTICE KENNEDY Why is that inconsistent with the notion that he might have turned and then turned back? Anything – although I'm not sure that's even suggested in the record. MR. AGUIRRE All of this happened within 30 seconds. That's sort of without dispute. It was very quick, rattling the door. They – I believe some of the witnesses testified that they were inside. They heard open the door, bang, bang, bang, the rattling of the door, and then shots and then a muzzle blast. JUSTICE KENNEDY This occurred in November, did it not? MR. AGUIRRE It did, yes, sir. JUSTICE KENNEDY November 1, and what time – do we know what time of the day this event took place? MR. AGUIRRE In the evening. JUSTICE KENNEDY Well, was it dark? MR. AGUIRRE Yes. JUSTICE KENNEDY No question about that. MR. AGUIRRE None. The porch light was off. Everyone testified that the porch light was unlit. JUSTICE KENNEDY How do we deal with Brousseau and Haugen case? You relied on our opinion, which was reversed by the Supreme Court. How do you think that plays into this analysis? MR. AGUIRRE I believe that an officer – there was just simply no facts to support his belief that there was a danger to himself or others. He testified that he was not concerned with himself. And at an earlier time in deposition, it was stated that he answered no. The officer said no to the statement that he believed that he did not shoot in the protection of others. However, at the summary judgment declaration, he switched his story and stated that that was his main concern. You don't find burglars that want to enter the home knocking on the door first. That should put Officer Davis on notice or alert him to the fact that this man knew the home, knew someone in there, in order to knock and announce his presence. JUSTICE KENNEDY So your argument basically is a straight Tennessee v. Garner argument? MR. AGUIRRE I'm not familiar with that case. Garner, yes, sir. JUSTICE KENNEDY Garner, yes. And that – but what Haugen and Broussard seem to say is we have to do an individual analysis that relying on Tennessee v. Garner isn't enough, generally speaking. But I gather your argument is that this is close enough to Tennessee v. Garner that it falls within that case.  MR. AGUIRRE Yes, sir. JUSTICE KENNEDY Well, as I understand it, you've got two issues. The first one is, was there a constitutional violation? And Tennessee v. Garner seems to establish that in the absence of evidence that he had probable cause to believe of a threat, a serious physical injury to himself or others. Then the question is, is there qualified immunity? Would a reasonable officer know that what he was doing violated the Constitution? That's the Haugen case. MR. AGUIRRE Yes. I believe initially there would be no need for Officer Davis to use deadly force. There's been absolute – there's nothing in the record to suggest that the man was threatening anyone. He was running away from the officer. He never looked back. He never said anything to the officer in a threatening manner. The only verbiage that we have from Mr. Aguirre, the decedent, is that, open the door. QUESTION Isn't the testimony of the – MR. AGUIRRE I'm sorry. QUESTION Isn't the testimony – I'm sorry. Isn't the testimony of the officer, at least, his own testimony, suggest that if it were credited that he would have a reasonable basis to fear for his safety? That is, if the decedent said, I've got a gun, and then refused to stop. But the issue, as I understand it, is whether there's a genuine issue of material fact, whether the officer really did fear for his own safety or others. MR. AGUIRRE True. QUESTION This was a summer judgment, right? MR. AGUIRRE Yes, that's correct. QUESTION As I understand your client's position, it's that the coroner's report, plus the other witnesses who didn't hear the man say, I've got a gun, that all this creates an issue of fact. MR. AGUIRRE That's true. That's absolutely correct. It's just somewhat odd, to say the least, that so many people heard the officer say, don't go in the house, yet they never heard the word gun or I have a gun come out of the decedent's mouth. And these were neighbors, one man driving by that stopped to watch, and the other witnesses that were in the house within one to two feet of the door. So to that extent, it might be a defense, but I think it's a tribal issue, as you've indicated. MR. RUBENSTEIN I think we have your argument at hand. Do you want to save some time for rebuttal? MR. AGUIRRE Yes, sir. MR. RUBENSTEIN Thank you. Thanks. May it please the Court. Good afternoon. My name is Sean Beeler. I represent the City of West Covina and Officer Kenneth Davis in this matter. I'd like to say first that this is precisely the type of case that qualified immunity was created to address. What we have here is a situation where Officer Davis acted reasonably under the Fourth Amendment. Officer Davis's decision to use deadly force was reasonable. His statements the night of the shooting and later in deposition were internally consistent. His beliefs or his statements were corroborated by an independent witness, Mr. Landeros, who he himself, without the benefit of knowledge of the car chase, formed the belief that Mr. Aguirre first tried to enter Landeros' house and Landeros told him not to. Second, that Mr. Aguirre may have been carrying a gun due to the fact that his hand was in his side and he was running in a canted position. Three, that he had that Mr. Aguirre had no idea who lived at the house.  Four, Mr. Landeros also heard exchanges from the officer and Mr. Aguirre, although they didn't know, he couldn't tell what was said, but he did hear stop at least twice. Mr. Aguirre unfortunately ran out of his car, ran towards Mr. Landeros' house, and then ran to another house, 832 West Michelle Street. That decision ended up costing him his life. But Officer Davis' decisions were reasonable. He saw someone else. Isn't that based on your or the officer's statements of facts? I mean, if I take the officer's testimony and that we have all of it, we just say that he reaches for his belt, looks like he's drawing a gun, it seems plain that qualified immunity ought to apply. If we adopt the plaintiff's version of the facts, which is that you have an unarmed man who's just trying to get in, he's opening the door, he's not trying to break in the window of a resident's girlfriend, and there's no warning and he's shot four times in the back, you say, well, qualified immunity doesn't apply to that. So if that's true, then don't we have to send that to a jury to sort it out? If it was true that there were no warnings given? I mean, it's not up for us to decide one way or the other what happened. The question is if we take the facts in the light most favorable to the plaintiff here, the question is how do you analyze qualified immunity in that context? I think that plaintiffs here had a duty to create a record for this court and to introduce admissible evidence to their facts that they did have at the district court, and they didn't do that. The idea of the coroner's report, the coroner's report, the coroner, and I did bring a few sector, I mean, I brought my opening brief here and I'd like to address that and just read one sentence. Within, with the body in motion, I can't tell you with a degree of certainty what angle, what the angles would be. The coroner testified that he couldn't tell exactly what, when they lay the body down in a static position, what the angles of entry would have been had the body been in motion. But did he testify that there were shots in the back? What he testified, I don't know that he said there were shots in the back. The, what the report is, is that there were shot in the right scalpula below, he said where the shoulder bone connects to the back, in the right axillary line right beneath the armpit, in the back of the right leg, which came out and most likely reentered in the abdomen. All those bullets entered in the right side of the body. Whether the angle, what the angles were, the coroner couldn't tell. But they entered in the right side of the body, which would at least support the inference that Mr. Aguirre started to turn to his right. The, the evidence here that, that the appellants offer, the ballistics. Well, let me, I'm looking at his testimony. And you say the shot actually went in a downward direction according to your arrows, yes. Answer yes. Okay, so it entered the back and was traveling in a downwardly direction and went through the two lungs, is that correct? Yes. So we've got. I believe it was in the, at the beginning in my statement of facts. I apologize. Oh, that's right. We can, we can, we have the record. We can look through that. You know, if, if the officer's statement is credited, of course, then there's no question that there's either no constitutional violation, no excessive force, because he has reason to fear his safety, or there's qualified immunity. But if a jury chose to disbelieve the officer, in light of the coroner's statement, or in light of the statements of other witnesses who didn't hear any reference to a gun, then would there be an issue of fact, a material issue of fact then? I don't believe so. I realize your position, I assume, is that you don't believe so. So I would want you to tell me why there isn't then. There's no question of fact that exists, because the appellants haven't offered any, all of the questions of fact that the appellants have tried to raise do not go to the reasonableness of Officer Davis's actions. Whether no one heard other than Officer Davis, or actually I can't say that, the question was never posed to any witnesses whether they heard, whether Mr. Aguirre said, I have a gun. They said, I heard one statement or another statement. I didn't hear that. Witness Landeros did hear an exchange between Aguirre, Mr. Aguirre and Officer Davis at the door. He didn't hear anything about a gun. He did not hear he had a gun. He formed an opinion that Mr. Aguirre may have been a gun. Well, that's not the same. But, no, he did not hear that statement. The fact that qualified immunity is supposed to protect an officer from going to trial, coupled with Mr. or Officer Davis's, what he saw under a totality of the circumstances, as he ran up to the door and he said, I heard he had a gun, he reasonably feared for the occupants of 832. The fact that Mr. Aguirre may or may have not known somebody in the house after the fact really were limited to what Mr. Aguirre knew at the time. He heard that, I have a gun, stay back. In a situation where an officer has a version of events and the other person is a decedent, we look to the internal consistency of the officer's statements. Both his statement on the night to the investigators and later in the deposition were consistent. We look at the corroborating evidence, which would be Mr. Landeros's testimony. There's no way that we can tell whether or not Mr. Aguirre said, I have a gun. No testimony is going to tell us definitively yes or no. We have Officer Davis's testimony. It's not a triable issue of fact, because there's no evidence that's been offered at summary judgment or in any deposition that would give, allow the trier of fact to make a decision one way or another. You have Officer Davis's testimony, and you have other people saying, I heard statements, but I couldn't hear exactly what was said. Kennedy. Well, under Garner, the officer would have to show that he had probable cause to believe that the suspect posed a threat of serious physical harm to the officers or others. Now, are you saying that on the record before us, a jury would be compelled to find that there was a threat of serious physical harm to the officer or others? Given the facts that faced Officer Davis that night, yes. Due to the facts in his ---- Yes to what? Yes to the officer or yes to others? Yes to both. That limited to what Officer Davis believed. And to Officer Davis, Mr. Aguirre had a gun. In his mind, Mr. Aguirre had a gun. And that when he got out of the ---- Qualified immunity focuses on the objective factors, not his subjective belief. The first prong, whether a constitutional right was violated, and in this case, the Fourth Amendment under Graham v. Conner says it's an objectable, excuse me, an objectable reasonableness test. However, when we step down into the second prong, whether the right was clearly established, we ask whether a reasonable officer in that officer's shoes would clearly understand that he was violating constitutional right with the circumstances that he was faced with. So in the second prong, we certainly need to look at exactly the specific circumstances that were facing Mr. Officer Davis. I can answer that, but I don't think we can get into his subjective beliefs at that point. What we have is his testimony. But what we also have, again, is Mr. Landeros' corroborating testimony that based on Mr. Aguirre running out of his car and the cantiposition as putting his hand, Mr. Landeros, an independent witness, believed that Mr. Aguirre had a gun. But that's a little different, it seems to me, than if the jury were to determine that the decedent said, I have a gun. I mean, Mr. Landeros' testimony on that is very speculative based on how he's holding himself. To me, at least, it doesn't add much. What I'm trying to figure out is whether under all the circumstances in a summary judgment context, and for certain if there was a trial and the jury credited the officer, he should win. But in a summary judgment context, is a jury compelled to make a finding that the decedent said, I have a gun, when other witnesses didn't relate that? So if you give all inferences to the appellant, aren't they entitled to the inference that maybe these people didn't say that because they didn't hear that? At the summary judgment stage, Judge Gold? Right. Yeah. Which is what this case is, right? Sure. At the summary judgment, defendant – excuse me, appellants are still bound to put forth admissible evidence. The witnesses that we're talking about here, it was hearsay. There is no admissible evidence from any of these witnesses. Mr. Landeros is the only one – excuse me, except for I believe it was Rosales who was sitting in a car and said, I didn't hear anything. The rest of the evidence is inadmissible. And that counsel referred to as ballistics and police tactics experts, that's not before us in the court. It's not part of the record. It wasn't part of the excerpts of record. All we have are bare statements in the opening brief. So – But weren't those declarations offered at the trial court? I wasn't a trial attorney on Mr. Colvin's case. They wouldn't be in the excerpt of record unless they came up from the trial court. Yes. And the excerpts of record were created by each side. I do not know whether there was a deposition of the expert or whether there was a declaration submitted on behalf of the appellants. But either way, it's not here. And the district court judge below also said that the witnesses – the witness statements came out of Detective Brown's investigation, his notes. Appellants took a deposition of Mr. Brown, who was a sheriff. And he had interviewed these people at the night based on what they heard. So it's these witnesses saying what they heard to Detective Brown, who said what they told him in a deposition months later. That's inherently unreliable. And district court judge, I believe, correctly deemed that inadmissible. First, he said that it actually supported the Officer Aguirre and City of West Covina's side because they corroborated that warnings were given for him to stop not to enter the house. But nonetheless, they were inadmissible, and he could not rely on them in summary judgment. So for a tribal issue of fact to exist, it has to go to the reasonableness in this matter, the reasonableness of Officer Davis's conduct. And the tribal issues in the brief really don't go to – if they are, it's the case of Reynolds v. the County of San Diego, where a minor inconsistency in Officer's statement does not create a tribal fact as to a reasonable belief. Here, if we say that because it's not corroborated that Mr. Aguirre said, I have a gun, if that was the only basis for allowing Mr. – or Officer Davis to use deadly force, then that would have far-reaching – far-reaching effect. In fact, the other part of this is that Officer Davis reasonably believed that the people at 832 West Michelle were in fear for their lives, that that officer or that Mr. Aguirre was trying to break into the house. Independent witness Landeros also said that he saw Mr. Aguirre banging on the door, pulling the doorknob back and forth, shouting, open up. Mr. Aguirre left his car down the street, not into the parking – not into the driveway of the house. There – there were no facts to indicate to Officer Davis that Mr. Aguirre knew who was in that house. Given the high-speed chase, given the reckless disregard Mr. Aguirre used in driving through a residential neighborhood at high speed, given his failure to obey any orders that – that Officer Davis was giving him, and then running up to the front door and shaking the door, it's reasonable to believe that Mr. Aguirre posed a threat to the inhabitants. Moreover, if we take it down and say to the clearly – whether it was clearly established that Officer – that it was Officer Davis violating Mr. Aguirre's rights by using lethal force at that time, I say we'd have to look to Malian Briggs – Malia V. Briggs that said that – that qualified immunity protects all but the plainly incompetent and those who knowingly violate the law. And there's nothing on the record that indicates that Mr. Davis – or that Officer Davis was plainly incompetent, nor did he knowingly violate the law. You know, the question is whether there's a danger posed on the objective facts to someone in the vicinity, which may be – depending on how you view the house, that may satisfy that. Or not. Yeah. So – I think we have your argument in hand, and do you want to talk about the Monel liability issue? Just briefly, that – Monel liability is derivative of a constitutional violation. If there is no constitutional violation, then there is no Monel liability. The – excuse me one second. What we had here, and it really wasn't addressed in the Collins opening brief, but the district court found that there was no violation of – that there was no evidence to support a Monel theory, a conspiracy theory, or a failure to detrain. We also argued that the negligence theory was not cognizable at law. What I would point the Court, because I believe I didn't adequately do so in my opening brief, is for Monel, special interrogatory number 7, which is in the appellee's excerpts of record page 52, the response thereto, which is in the appellee's excerpts of record number 66. The – on conspiracy, our special interrogatory number 13 at appellee's excerpt of record 72, the response at 72 to 73, and the failure to train, special interrogatory number 22 at appellee's excerpt of record page 81, and the response at appellee's excerpts of record 81 to 82. And what all these questions show is we specifically asked the appellants their theory and the facts that support the theories of Monel conspiracy and failure to train, and all we got were dilatory objections. There was not one factual response given. And based on Celotex, the Celotex decision and the ability to point to a lack of admissible evidence that the defendants had satisfied their burden as to those counts. I take it discovery was closed prior to the filing of the motion for summary judgment? I believe it was, but because I wasn't a trial attorney, I don't want to guarantee it. Any further questions? Thank you, counsel. Thank you very much. Mr. Buttle. Yes, Your Honor. It appears as though the lower court changed the burden from the appellants to the respondent. The lower court accepted, apparently, all of the facts that Mr. Officer Davis stated and completely excluded the other eyewitnesses. In regards to the Monel, Officer Davis' deposition testimony at page 50, lines 2 through 15, in effect states that he was instructed to use deadly force even if he was not threatened. I think that's a – that would certainly help the cause as it relates to bringing the city in as a party defendant. Mr. Landeros never stated that Mr. Aguirre was attempting to go into his home. What happened is that Mr. Aguirre exited his vehicle at the curb and – at the curb of Mr. Landeros' home and began to go westbound or back from where he was on the sidewalk, and at that point in time, Mr. Landeros was in his yard on his lawn and simply stated, don't come in here. He did see the man, or at least he observed Mr. Aguirre with his hand on his waist. However, young men now apparently can't walk all that fast without holding their pants up, I've seen. And that the – just jumping farther, and maybe that's why he was asked the question, did you believe the man had a gun in his hand or had a weapon on him? And I believe there was an objection, and he volunteered and said yes. I really couldn't – I didn't know, but possibly he did. Mr. Davis was given three versions of what happened that evening. He was asked why was he pursuing the man. Well, he violated a traffic infraction. Also, he stated that he was at a high-speed chase going up to 50 miles an hour, and then at another time he said he was going 20. He had his lights on, he saw gang signs, but yet he couldn't tell the interrogator what those gang signs were. Just as an aside, but all of the witnesses that were in that home were taken down to the police station immediately and interviewed by the officers, as well as the deputy district attorney's deputy. And they gave their statements. At no point in time were they ever recorded saying that they had seen a gun, heard a gun, or come anyone saying anything about a gun from Mr. Aguirre. Well, the district court excluded those statements, as I understand it, because you only put them in through Detective Brown and didn't have direct evidence. Is that right? I did not. Mr. Stolfman did all the discovery, and he advises me now that those tapes were provided to the courts, and there was excerpts of records, somewhat voluminous, presented to the court that he and I presented. So if we go back to the district court record, what you are tendering today or saying is that we will find statements that were taken, but these witnesses were not deposed by you. Yes, they were. Several of them were. Mr. Linderos and Mr. Rosales. I believe quite a few of them. There was about six or seven depositions that were taken. I just don't have them off the top. Officer, the Deputy Sheriff Brown, his deposition was taken at length. Right. What the district court says in a footnote is that Detective Brown refers to a number of statements, but then it concludes, in any event, the testimony is hearsay and cannot be relied on by the court to grant defendants' motion. So what we did, we presented the copies of the tapes that were provided by Mr. Colvin, the city attorney's. Okay. Very good. Thank you, sir. Thank you both for your arguments. The case is heard, will be submitted, and we'll be in recess. All rise.
judges: Thomas, Gould, Schwarzer